SETH HADFIELD, TRUSTEE, *vs.* WILLIAM J. TRACY.

First Judicial District, Hartford, March Term, 1924.

WHEELER, C. J., BEACH, CURTIS, KEELER and BANKS, Js.

The stockbroker acts in a three-fold relation; first, in purchasing the stock he is an agent; then, in advancing money for the purchase he becomes a creditor; and, finally, in holding the stock to secure the advance made he becomes a pledgee of it.

The broker becomes the pledgee of the stock and has the privilege and power to sub-pledge it as collateral for his own loans or to secure purchases made on his account by other brokers; he may substitute other shares of stock of like kind for those originally purchased or he may deliver the shares of one customer to another; but it is his duty to keep on hand at all times sufficient certificates of stock to meet his customer's legal demand for delivery.

And throughout the life of the account and even though the broker becomes insolvent or bankrupt, the customer remains the owner and pledgor of the number and kind of shares purchased for him unless he has abandoned or given up his ownership in them; he always has a right to immediate delivery upon payment of the balance due on the purchase price; and such delivery, though made during the broker's insolvency, does not constitute a preference under the Bankruptcy Act.

In the present case, the defendant made a series of purchases on margin through a local broker, H, who hypothecated the shares with his

Hadfield *v.* Tracy.

New York brokers, C and L, and later C and H became insolvent. Immediately thereafter H and the defendant agreed that H should deliver to the defendant such stocks as H or L had which had been purchased for the defendant and were held on pledge, and that H should purchase in the market like shares of stock hypothecated with C, and in consideration the defendant agreed to pay the balance owed upon the stocks purchased for them and hypothecated with C and H. Thereupon H ordered L to deliver to the defendant such list of stocks. L purchased in the market the stocks not held by him in pledge and delivered to the defendant the stocks so purchased in the market together with those belonging to the defendant and pledged by H with L and received from the defendant the balance due upon the stocks purchased for him and hypothecated with C and L by H. L used this balance so received to pay for the stocks purchased in the market and applied the balance remaining of $1,686 to H's indebtedness to him. In an action by H's trustee in bankruptcy to recover the value of the shares delivered to the defendant on the ground that he had thereby received a preference, it was *held:*—

1. That the trial court's finding that the defendant knew that his shares would be hypothecated by H was a legitimate inference to be drawn from the admitted fact that his marginal account was conducted under the customary conditions of such transactions.

2. That the trial court's conclusion that the defendant had by his conduct abandoned title to all his shares was reviewable either as a conclusion of law or as a conclusion of fact from the subordinate facts found.

3. That the trial court correctly held that the defendant, by his agreement with H after his insolvency, had abandoned title to such of his shares as had been hypothecated with C, but that it erred in holding that he had abandoned title to such of his shares as had been hypothecated with L, since the only logical conclusion to be drawn from the finding was that the defendant had, in effect, ordered delivery of his own shares held by L—a step which he was legally entitled to take at any time upon payment of the unpaid balance due thereon, and which resulted in a preference in this instance merely because such balance was only partly paid, viz., to the extent of $1,686, thus reducing the general assets of H by the difference between the value of the stock surrendered by L and such part payment plus whatever margin the defendant had originally deposited on the shares, an amount for which the plaintiff was entitled to a judgment.

4. That the delivery to the defendant of the stocks purchased by L in the open market did not constitute a preference because they were fully paid for by the defendant.

5. That the purchases by H of twenty shares of American Smelting

and Refining Company stock for the defendant, was an outright purchase made on order of the defendant and had nothing to do with these margin accounts.

Argued March 4th—decided June 23d, 1924.

ACTION by a trustee in bankruptcy to recover the value of an alleged preferential and illegal transfer of stock by the bankrupt to the defendant, brought to and tried by the Superior Court in Hartford County, *Maltbie, J.;* facts found and judgment rendered for the plaintiff for $10,855, and appeal by the defendant. *Error; new trial ordered as to damages only.*

Hull, Ingraham & Company, Incorporated, a Connecticut corporation, hereinafter called Hull Company, was engaged in the stock brokerage business in Bristol and executing its customers' orders by buying and selling securities through Clarke and Company and R. G. Latham, of New York, and Milliken and Company in Boston, and hypothecated the stocks bought by its customers on margin with these New York brokers. The defendant, Tracy, was a customer of Hull Company and on March 4th, 1922, had with it a margin account conducted under the customary conditions of margin accounts between a stockbroker and his customer. Tracy knew that stock bought for his account would be hypothecated by Hull Company with stockbrokers in New York or Boston, and knew that Hull Company acted largely through Clarke and Company.

Sigourney, Pratt and Grimley were also customers of and had margin accounts with Hull Company conducted in accordance with the customary conditions of such accounts. On March 1st, 1922, Tracy ordered of Hull Company in behalf of himself and Grimley their stocks delivered to them and said they would pay the balance due thereon on delivery in Bristol, but at the request of Hull Company he agreed to wait deliv-

ery for two days. On March 3d, 1922, Tracy again ordered delivery of the stocks held on his and Grimley's account. Neither Tracy, Sigourney, Pratt nor Grimley knew that Hull Company was insolvent on March 3d, and each of them was entitled to the delivery of his stock on payment of amount due thereon. On this date Tracy ordered on his own account 20 shares of stock of the American Smelting and Refining Company, payment to be made upon delivery of all of his stocks. A reasonable time to have made such delivery was on or before the close of business on March 3d. On March 4th, 1922, the shares of stocks to which Tracy was entitled to delivery were: 2450 of Willys-Overland Company; 47 Bristol Realty Company; 200 Middle States Oil Company; 200 General Motors Company; 400 Loew's, Incorporated, and 20 American Smelting and Refining Company. Tracy owed Hull Company on these stocks $20,607.39.

On March 4th, 1922, the shares of stocks to which Sigourney was entitled to delivery were: 200 Loew's, Incorporated; 200 Middle States Oil Company; 77 General Motors Company. He owed Hull Company on these stocks $3,625.97.

On March 4th, 1922, the shares of stocks to which Pratt was entitled to delivery were: 306 General Motors Company and Liberty Bonds in the amount of $250. He owed Hull Company on these $1,985.72.

On March 4th, 1922, the shares of stocks to which Grimley was entitled to delivery were: 300 Willys-Overland Company; 100 Loew's, Incorporated. He owed Hull Company on these $2,062.92. All of these accounts were secured by sufficient margins. At the close of the market at 3 o'clock on March 3d, Clarke and Company suspended business and this fact was communicated to Hull Company about 11:30 o'clock on the following morning of March 4th. At all times

subsequent to March 4th, 1922, Hull Company had reason to believe and did believe that Clarke and Company were insolvent and Tracy had reasonable cause to believe that Hull Company was insolvent. On this day Hull Company had sufficient stocks hypothecated with Clarke and Company and Latham to have met these demands.

On Sunday afternoon, March 5th, Hull Company had a statement made up of the accounts of Tracy, Sigourney, Pratt and Grimley, and took these to a conference at the Bristol National Bank, of which Tracy was a director. There were present at the conference Tracy, Sigourney, Grimley, Hull of Hull Company, and their attorney, and Mr. Calder, vice-president of the bank, who attended at the request of Tracy. At this conference it was agreed that the Bristol National Bank should arrange with the Hanover National Bank of New York to receive stocks to be delivered by R. G. Latham for the accounts of Messrs. Tracy, Sigourney, Pratt and Grimley and upon delivery the Bristol National Bank would pay to Latham the amounts due on these accounts. And the only other business transacted at this conference was to arrange for a loan to Tracy by the Bristol National Bank to cover its advances to the Hanover National Bank for Latham.

The said amount due Hull Company by Tracy, Sigourney, Pratt and Grimley was $28,246, being the advances of the Bristol National Bank to the Hanover National Bank. On March 5th, Hull Company mailed Latham an order to deliver to the Hanover National Bank for the account of the Bristol National Bank, upon receipt of $28,246, 2750 shares Willys-Overland Company; 700 shares Loew's, Incorporated; 400 shares Middle States Oil Company; 580 shares General Motors Company, and 20 shares American Smelting and Refining Company; these being all of the stocks due

on the margin accounts of Tracy, Sigourney, Pratt and Grimley. Hull Company's Bristol office was open during the week of March 6th, but the company refused to do business with customers generally, and its business was suspended until the filing of the petition in bankruptcy on April 22d, 1922.

Latham made delivery on March 10th to the Hanover National Bank of all of the stocks due Tracy, Sigourney, Pratt and Grimley, and the bank paid him therefor $28,246, and these stocks were subsequently delivered to the Bristol National Bank and by it delivered in accordance with the agreement of March 5th. To make the delivery to the Hanover National Bank, Latham bought in the market, 2400 shares Willys-Overland Company at $5\,^5/_8$, $13,596; 700 shares Loew's, Incorporated, at 14, $9,856; 140 shares Middle States Oil Company, at $13\frac{1}{2}$, $1,901.20; and 30 shares General Motors Company at $8^5/_8$, $259.95; the total cost being $25,613.15. And he used shares of stocks hypothecated with him as follows: 350 Willys-Overland Company; 260 Middle States Oil Company; 550 General Motors Company, and 20 American Smelting and Refining Company. This transaction reduced the debt of Hull Company to Latham, $2,632.85, and took from Latham's possession stocks held by him as pledgee for the account of Hull Company, of the market value of about $10,000.

A creditors' committee, on April 19th, 1922, made demand upon Tracy for the return of these stocks. No other demand than the bringing of this action was ever made upon Tracy for the return of these stocks.

The trial court reached the following conclusions of law: (1) Messrs. Tracy, Sigourney, Pratt and Grimley owned the stocks purchased for them by Hull Company and hypothecated by it with Clarke and Company and Latham. (2) Prior to the bankruptcy of Hull Company they might have claimed

Hadfield *v.* Tracy.

delivery of the stocks so hypothecated with Latham, or any stocks of the same kind purchased by Hull Company to replace those originally bought for them, upon payment of the balance due Hull Company on account of such purchases. (3) The transaction of March 5th, amounted to a waiver by Tracy, Sigourney, Pratt and Grimley of their title to such stocks, including those hypothecated with Latham, and an election to take a position as creditors of Hull Company, who were demanding payment of their claim, not in money but in stock, and that position they occupied thereafter. The transfers of stock to Messrs. Tracy, Sigourney, Pratt and Grimley constituted a voidable preference within the meaning of § 60 of the Federal Bankruptcy Act. (4) The plaintiff elected to recover the value of the stocks on August 24th, 1922, the date of this action, and is entitled to recover their market value on that day, less the amounts paid Latham through the Hanover National Bank, with interest from August 24th, 1922.

*William E. Egan* and *Frank E. Healy*, for the appellant (defendant).

*Josiah H. Peck*, for the appellee (plaintiff).

WHEELER, C. J. The ownership in the stocks purchased by Tracy on a margin account with Hull Company and by them hypothecated with Clarke and Company and Latham, brokers in New York, under the customary conditions of margin accounts between stock brokers and their customers, is not, under our law, in doubt. Nor is there anything in the corrections of the finding, with a single exception or two, which, if made, could change the result under the rules of law which were announced in *Skiff* v. *Stoddard*, 63 Conn. 198,

26 Atl. 874, 28 *id.* 104, and have since remained the law of this jurisdiction. It is claimed by Tracy that the court was not authorized in finding that Tracy knew that stock bought for his account would be hypothecated by his brokers. We think this was a legitimate inference for the trial court to draw. Further, when in the same paragraph (7) of the finding it is stated that the course of business between Tracy and Hull Company was conducted under the customary conditions of margin accounts between stockbrokers and their customers, and no motion to correct this part of the paragraph is made, we must accept the finding that the customary conditions of margin accounts existed between these parties as equivalent to finding, among other things, that it contemplated the hypothecation of these stocks by the brokers. The trial court was fully justified in view of the course of the trial in assuming that the customary conditions in margin accounts such as those before the court were as detailed in the exhaustive finding in *Skiff* v. *Stoddard, supra.* The only remaining corrections to which we need refer are the addition of paragraphs 39 and 40 of the draft-finding, and the finding in paragraph 51a that the effect of the transactions between Hull Company and Tracy, Sigourney, Pratt and Grimley was an abandonment by them of title in the shares of stock theretofore owned by them and in the possession of Hull Company, Clarke and Company and Latham, and an election to stand as creditors of Hull Company demanding payment from them, not in money but in stock. This is found as a fact, but it is obvious that it was not found from any direct evidence and must be either a conclusion of fact from the subordinate facts found, or a conclusion of law. In either case the conclusion would be reviewable and will be considered at a later point in the discussion. Paragraphs 39 and 40 of the draft-finding should have

been made a part of the finding. The twenty shares of stock of the American Smelting and Refining Company was a purchase made by Hull Company upon an order of Tracy on March 3d, and was to be paid for on delivery of the stock ordered out by Tracy. It had nothing to do with the other stocks held by Hull Company for Tracy and others, on margin. This purchase was made by Latham on order of Hull Company and was paid for with the funds sent to the Hanover National Bank upon the delivery of certain stocks to it, the balance only having been used in the completion of the transaction with Tracy and others, and forming part of the real controversy in this action. Jones on Pledges, § 496, compactly and accurately states our law when he says: "The broker acts in a threefold relation: first, in purchasing the stock he is an agent; then, in advancing money for the purchase, he becomes a creditor; and, finally, in holding the stock to secure the advance made, he becomes a pledgee of it." See also *Skiff* v. *Stoddard*, 63 Conn. 198, 26 Atl. 875, 28 *id.* 104; *Richardson* v. *Shaw*, 209 U. S. 365, 28 Sup. Ct. 512. These cases also decide that Hull Company became the pledgee and Tracy the owner of the stocks purchased for him by it, and they accord to it the right to substitute other stock of the same kind in place of the stocks purchased for Tracy. They also give Hull Company the right to pledge these stocks as collateral for its own loans and to hypothecate these stocks with other brokers to secure purchases made by these brokers for it. And they give to Tracy as the owner of the stocks the right at any time to demand his stocks, and to obtain delivery whether these were bought for him, or were other stock of the same kind held by Hull Company or Clarke and Company, or Latham for it, upon paying the balance of the purchase price of the stocks bought for him or of those substituted for these. Mr. Justice McReynolds

in *Duel* v. *Hollins*, 241 U. S. 523, 527, 36 Sup. Ct. 615, says: "That as between themselves, after paying amount due brokers, the customer had a right to demand delivery of stocks purchased for his account; and such delivery might have been made during insolvency without creating a preference." And in *Gorman* v. *Littlefield*, 229 U. S. 19, 24, 33 Sup. Ct. 690, it is held: "It is enough that the broker has shares of the same kind which are legally subject to the demand of the customer. And in this respect the trustee in bankruptcy is in the same position as the broker." See also *Sextons* v. *Kesler*, 225 U. S. 90, 32 Sup. Ct. 657.

Collier on Bankruptcy (13th Ed.) Vol. 2, § 70, p. 1662, condenses the law upon this subject as found in the decisions of the United States Supreme Court and in *Skiff* v. *Stoddard*: "When a broker agrees to carry stock for a customer on margin he may buy stock to fill several orders in a lump; he may increase his single purchase by stock of the same kind that he wants for himself; he may pledge the whole block thus purchased for what sum he likes, or deliver it all in satisfaction of later orders, and he may satisfy the earlier customer with any stock that he has on hand or that he buys when the time for delivery comes. It is the duty of the broker, however, if he sells shares specifically purchased for a customer, to buy others of like kind, and to keep on hand subject to the order of the customer certificates sufficient for the legal demands upon him. For this reason a delivery of stock to a customer by an insolvent broker is not a preference."

Hull Company, though insolvent, upon demand by Tracy for the delivery of his stocks on March 3d, could have made such delivery from the stocks of like kind pledged by it with Clarke and Company and Latham, upon the payment by Tracy of the balance owed upon the stocks purchased for him. Tracy's ownership in

these stocks did not cease because of the subsequent insolvency and bankruptcy of Hull Company, unless he had by his own conduct given up or abandoned his ownership. The trial court so held and met this issue fairly and definitely by holding that Tracy had by his conduct abandoned the stocks in Clarke and Company's possession and likewise those in Latham's possession. "The defendants had," says the trial court, "their election; they might have rested on their ownership of the stock held by Latham in the account of the bankrupts, and have redeemed it by paying such amounts as might be necessary, . . . or they might have waived their title to that stock and rested upon their position as creditors of the bankrupts. . . . This latter is the course they took." The difficulty in this conclusion is in the finding. The transaction of March 5th, upon which the court relies for this conclusion, does not sustain it. Hull Company's letter of March 5th to Latham directed him to deliver to the Hanover National Bank for the account of the Bristol National Bank all of the securities purchased by Hull Company for Tracy upon the receipt of the total amount of the unpaid purchase price of these stocks. Latham held a number of shares of stocks of the same kind pledged by Hull Company with him. It is an unreasonable interpretation of this order to hold it to mean that Latham was to go into the market and buy all of these stocks when he held about $10,000 worth of these stocks pledged with him by Hull Company. What he did do was to deliver to the Hanover National Bank the stocks of the kind purchased by Tracy and held by him in pledge for Hull Company, and the balance of these stocks which he purchased in the market. What Latham did accords with the reasonable interpretation of the direction of Hull Company to him. There is no suggestion in the record that Latham disobeyed Hull Company's

direction; on the contrary, the fair inference is that he obeyed it.

It hardly appears credible that anyone experienced as Tracy evidently was in margin transactions, would deliberately abandon his ownership of the stocks in which he had an ownership and in place of this ownership elect to stand as a creditor for his entire claim, when he knew Hull Company was insolvent. Such course would have been extreme folly. The trial court stated with accuracy and definiteness our law as to Tracy's right of ownership of these stocks in Latham's hands. The trial court reached the conclusion that when Tracy ordered Hull Company to deliver all of the stocks purchased by it, he knew that Clarke and Company had failed and the stocks purchased for him and hypothecated by it could not be made available in meeting this order for some time, and hence he knew that as to all such stocks not in the hands of Hull Company and Latham, it was necessary that Latham purchase these in the market. When Tracy issued this order to Hull Company on March 5th, it was an abandonment of his position as pledgor of the stocks in the hands of Clarke and Company, for he knew that Hull Company could not get possession of these stocks. To this extent we agree with the trial judge. But we are unable to take the next step in his process of reasoning. "Fundamentally," he says, "we are dealing here with the intention of the defendants in the transaction of March 5th, and it seems to me clear that no distinction can be made as to the stocks in the hands of Latham and those in the hands of Clarke; they must be deemed to have abandoned both as far as concerns their title to them, as their own specific property, and to have assumed as to both the position of seeking, not the surrender to them of their own property, but the satisfaction of an obligation to them by reason of the bankrupts' in-

ability to deliver to them in its entirety the stock they owned."

There was no such inseparable connection between the pledged stocks in the hands of Clarke and Company and in those of Latham. And no reason why the pledgor could not abandon his title as to the one without affecting his title as to the other. If we are "dealing . . . with the intention of the defendant in the transaction of March 5th," as the court says, there are no facts found from which an intention on the part of Tracy to abandon his title as pledgor of the stocks in the hands of Latham can be found. Every relevant fact found or inference from the facts found denies this conclusion. Tracy had ordered the stocks delivered to him on March 1st, March 3d, and again in the order of March 5th, and it was to his interest that Hull Company should deliver to him all stock which it had purchased for him, or was holding directly or through hypothecation, and which were subject to his order. What the transaction of March 5th was and was intended by the parties to be, was this: Hull Company was to deliver such stocks as Tracy and others had purchased of them as it or its pledgees had in their possession and which were then obtainable by it, and to secure the balance in the market. That is, Hull Company agreed to deliver all such stocks as it or Latham held, and to purchase like shares of the stocks hypothecated with Clarke and Company, in the market, and Tracy and others agreed to pay therefor the balance owed upon the stocks purchased for them and hypothecated with Clarke and Company and Latham, viz: $27,300. Latham, on Hull Company's order, purchased the balance of such stocks with the $27,300, and applied the balance of this sum $1,686.85 to reduce the indebtedness of Hull Company to Latham by this amount. Latham turned over on Hull Company's order to him the stocks held

by him as pledgee for Hull Company which had purchased such stocks for the account of customers and in which stocks Tracy and others had an interest and a right to demand, on payment of the balance owed Hull Company on them. They did not pay any part of this balance except $1,686.85, and obtained stocks of the then market value of about $10,000. Tracy and others still owe this difference between the unpaid purchase price of these stocks and the $1,686.85. The balance of the $27,300 which Tracy paid to Latham through the agency of the Bristol and Hanover banks was used to purchase and pay for stocks delivered to him. As to these there can be no question of a preference. Tracy's and the others' money paid for them. As to the unpaid balance of the purchase price of the stocks pledged with Latham, Tracy and others are still indebted to Hull Company, which either paid this unpaid balance or became obligated to Latham to pay him for it.

Tracy and others and Hull Company intended by the transaction of March 5th, to effect delivery to Tracy and others of all of the stock purchased for them by Hull Company upon their paying the unpaid balance of the purchase price. The agreement would have been unassailable had not Hull Company within four months become bankrupts. In the absence of such bankruptcy they not only had the right, but were obliged to meet the order of Tracy and others. But they could not use their general funds in order to do this, without having the amount so used declared a preference in case within four months they should go into bankruptcy. The unpaid balance of the purchase price less the $1,686.85 which Hull Company in effect gave to Tracy upon the delivery by Latham of the pledged stock was a preference, and remains a debt owed by Tracy to Hull Company, to which the plain-

tiff trustee is entitled. The transfer of the pledged stocks was made when Hull Company was insolvent and within four months of the filing of the petition in bankruptcy, and its effect was to take from the assets of the bankrupt estate this unpaid balance and give to Tracy and others a greater percentage of their debt than any other creditors of the same class, and this constituted a preference under the Bankruptcy Act, § 60a.

The judgment against Tracy would be the balance payable by him upon the shares of stock owned by him as pledgor in the hands of Latham and delivered to the Hanover National Bank for Tracy less his proportionate share of the $1,686.85, which the Hanover National Bank paid to Latham in excess of the amount expended by him in the purchase of stocks delivered to the bank for Tracy. What these proportionate amounts of the $1,686.85 are can be computed from the facts found. What the unpaid balance due on these stocks by Tracy on March 10th was cannot be ascertained upon the record; for this reason the case must be sent back for a rehearing on the damages.

There is error; the judgment is set aside and the cause remanded for a hearing upon the amount of the damages, with direction to the Superior Court upon such hearing to enter judgment in favor of plaintiff in accordance with the foregoing opinion.

In this opinion the other judges concurred, except CURTIS, J., who dissented.