OLIVER C. CLEMENTS, complainant,

*v.*

R. J. ARROWSMITH, INCORPORATED, a corporation, and R. J. ARROWSMITH, individually, defendants.

[Decided August 30th, 1932.]

*Messrs. Lum, Tamblyn & Colyer,* for the complainant.

*Mr. Richard J. Fitz Maurice,* for the defendants.

BACKES, V. C.

R. J. Arrowsmith, Incorporated, was a stock brokerage house in East Orange until it failed in December, 1930. The complainant, Clements, dealt with it in stocks on a margin account, was an ardent speculator and its best customer. His margin was in the thousands, his speculations in the hundreds of thousands of dollars, and his account usually carried fifteen to twenty different stock issues which he bought and sold in his daily play with the market. He was experienced in the game when he started the account with the Arrowsmith company in 1928 and was successful until the crash in November, 1929. Even after that event he had a substantial balance to his credit and continued to play until finally, June 19th, 1930, his account was closed, leaving him indebted to the Arrowsmith company, according to the closing statement, in the sum of $10,843.33, for which he gave his note.

The bill is filed to cancel the note on the ground of the breach of a trust alleged to have been assumed by R. J. Arrowsmith, the president, in January, 1930; that during a period of the complainant's absence in Arizona, and while his brother would have charge of the account, Arrowsmith would give the account his best personal attention and avoid involving the complainant in investments in stocks and other securities of a speculative value. The breach alleged is that the brother was advised on April 9th, 1930, to purchase one thousand shares of the Plastic Stone Products Corporation at $13.50 per share, which in the closing statement of the account was marked off at $1, a total loss to the complainant; that since the settlement it has been discovered that the stock was not a good and safe investment and that the defendant knew it to be worthless; that it was not purchased in the open market, but was sold to the complainant directly by the defendant company through R. J. Arrowsmith (president) and that the company made a large profit; that the defendant company and R. J. Arrowsmith knew and concealed from the complainant and his brother that the corporation had never made a profit and had from

its inception lost money, and that the shares in reality had no value and were not a good and safe investment, and that as a result of the misrepresentation (no specific misrepresentation is charged) and of the concealment as to the financial condition of the corporation the complainant was induced to purchase the stock, to his loss. Although there is a charge of fraudulent concealment and a general charge of misrepresentation, Mr. Lum says that the gravaman of the bill sounds in contract, in breach of contract, breach of trust, and that any implication of fraud arising from the testimony is "incidental only to our charge of breach of contract;" and we approach the decision in that aspect. The closing statement, as an account stated, is not in dispute except as to the one item, and the case, as tried, turns upon whether there was a trust (or contract) and, if so, was it breached in permitting the brother to purchase the one thousand shares.

Before leaving for Arizona the complainant gave a general power of attorney to his brother on January 29th, 1930, who immediately took quarters in the Arrowsmith office to watch the ticker and the account, both of which were active and needed watching. The complainant testified, in effect, that he asked Arrowsmith to "supervise my account," and "I advised him I did not care to buy any speculative stock, only A-1 dividend stock" and "I told him I did not care about making so much money in it; that I wanted to keep it intact," and that Arrowsmith promised "to supervise the buying and selling of the stock." The brother, in corroboration, adds that the complainant said to Arrowsmith that he did not care to speculate "but asked him to invest in good investment securities," and "Mr. Arrowsmith agreed to give it his personal attention and supervision." Quite a task and responsibility for a busy broker to undertake, and Arrowsmith says he refused, that it would take up all his time to the exclusion of all his other customers and their business. His denial is believable, for what was asked of him, practically, was to guarantee the account; he was to supervise a speculative account, but not to specu-

late, and yet to speculate in only A-1 dividend stock, or, as the brother says, in good investment securities—a responsibility for which, in those feverish days, he could have set his own price with almost any operator. He is outnumbered by the two brothers, but the weight of testimony is not governed by the number of witnesses. The tale of the two brothers is out of harmony with all common experience, and their testimony is self-discredited by the fact, as admitted by the brother, in charge of the account, that he never thereafter consulted Arrowsmith about the account and that Arrowsmith was not called upon to and did not supervise it. Why not, if he was to give it his personal attention? The alleged promise of personal supervision finds further disproof in the brother's admission that his consultant was one Meeker, a stock salesman of the Arrowsmith company, and not Arrowsmith. Meeker was an intimate friend of the complainant and the brother, who brought the complainant's account to the Arrowsmith company. Their confidence was in him and, when advice was sought in the gamble, throughout the account with the Arrowsmith company, they turned to him. And faith in them is further shaken by the fact that the two brothers, in constant touch with each other by mail and phone, speculated as intensively after as before the alleged Arrowsmith arrangement, although Arrowsmith's supposed instructions were not to buy any speculative stock except A-1 dividend stock, or to invest only in good investment securities. What were at that time or are at any time "A-1 dividend stocks" or "good investment securities" admits of no definition. Ask those now in the dumps who in the flush days of '29 thought they knew. We point out these things to manifest the improbability of the complainant's story, our belief that it is an exaggeration and distortion of his relation with the broker, and a conviction that there was no contract or trust.

When the account was started in June, 1930, the Arrowsmith company treated the complainant with uncommon consideration. His indebtedness to it was $117,229.33, against which it held his stocks. Had he been closed out in the regu-

lar course of trade, by a sale of the stock on the market, his deficiency would have reached, it is said, upwards of $30,000. Throwing large blocks of stock on the market kills the price. Instead, the securities were taken over by the Arrowsmith company at their market ratings, aggregating $106,386, and later parted with at a terrific loss. Two items of stock were taken over at $1 each, a total loss to the complainant; one thousand shares of Detachable Bit Corporation purchased at $15 a share, and the one thousand shares of Plastic Stone Products Corporation at $13.50. The Detachable Bit stock was bought by the brother February 5th, 1930, the Plastic, April 9th, while the complainant was in Arizona. Neither was a listed stock and both were in violation of the supposed instructions to Arrowsmith to purchase none but A-1 dividend stock or "good investment securities." Both were selected by the brother without consulting Arrowsmith, but the Plastic stock purchase is seized upon as the more vulnerable to establish a breach of trust and to escape the obligation of the note. Silence as to the purchase of the Detachable Bit stock is significant, for if Arrowsmith was in charge of the account and responsible he was guilty of a breach of confidence and liable for delinquency as to both, and yet he is charged only as to the Plastic stock. The brother says Arrowsmith recommended the Plastic stock as a good investment. That is demonstrably untrue as to the issue of stock he purchased, for it was not authorized until March 6th, it was bought by the brother April 9th, and it is an established fact that Arrowsmith was stricken on March 6th and was away from his business from that day until May. It may be that Arrowsmith, before he was taken down, recommended an earlier issue and if that be so, the brother was not careful to state that the advice was unrelated to the purchase he made.

The Plastic Stone Products Corporation was a New York concern developing the patents of a Dr. Zerlup, for the manufacture of artificial marble for walls in public buildings. Snyder & Company, New York brokers, underwrote the original stock issue at $2.50 a share, which gave the cor-

poration a working capital of $50,000. The stock was sold to the "dear public" at $12.50 a share. The Arrowsmith company purchased it at $7.50 per share and sold it to clients at the standard price. That seems to have been the way of the day; everybody was speculating. Arrowsmith himself was an investor and so were the members of his family and his friends. Another Ford was in the making, but something went wrong and, in February, 1930, the company's capital was nearly exhausted. Arrowsmith, by then a director, heavily involved personally, and morally to his customers, undertook a refinancing. Dr. Zerlup had additional and supposedly valuable inventions which he assigned to the company. "Insiders" put in $30,000 and Arrowsmith agreed to purchase a new issue of twenty thousand shares at $7.50 a share, which would give the company an additional working capital of $150,000. The stock issue was trusteed with the Chemical National Bank of New York and was to be taken down by Arrowsmith in installments at fixed periods within twelve months. The agreement was signed March 6th and Arrowsmith paid down the first installment of $25,000. That is the day he was stricken. Meeker, the salesman, went among his (Meeker's) customers, purchasers of the first issue, let them in on the ground floor at their previous price of $12.50 a share, and they bought. New customers, and the complainant was one of them, paid $13.50 per share. In all, Meeker says, he sold $180,000. The difference between his purchase and the sales price, Arrowsmith says, was eaten up in the refinancing and sales costs; the salesman got sixty per cent. of it, leaving a profit to his company of $1 a share. Before Arrowsmith returned in May, the Plastic Products Corporation collapsed. Dr. Zerlup, the inventor, became dissatisfied and withdrew, and with him went his investions and patents. The merits of the inventions are not questioned, nor can the good faith of Arrowsmith be doubted, for his own heavy losses bear testimony to his honesty of purpose as well as his gullibility. Everybody in the "street" was that way. Meeker, who made the sale to the complainant's brother, gave him, he says,

and it is not denied, all available information he had, and the brother took his time in buying. The Arrowsmith company, it is true, was responsible for Meeker's limited salesman agency, but his conduct is not impugned, except, as counsel says, as "incidental to our charge of breach of contract."

Were we called upon to decide the question of fraud as a primary issue, we could not find that there was deceitful misrepresentations or concealment, but that is not our office at present. We hold that there was no contract or trust and no breach of trust and we decide the issues as raised by the pleadings as limited by the trial counsel, against the complainant.

The bill will be dismissed.