410 P.2d 658

**WALSTON & CO., Inc., a corporation, Appellant,**

**v.**

**Joseph B. MILLER and Adina Miller, husband and wife, Appellees.**

**No. 7338.**

Supreme Court of Arizona.

En Banc.

Feb. 2, 1966.

Ryley, Carlock & Ralston, Phoenix, for appellant.

James E. Flynn, and Allan K. Perry, Phoenix, for appellees.

Evans, Kitchel & Jenckes, Phoenix, and White & Case, New York City, as amicus curiae for Assn. of Stock Exchange Firms.

MARY ANNE RICHEY, Superior Court Judge.

This appeal arises out of a cause of action brought by Walston and Co., Inc:, appellant, hereinafter referred to as Walston, against Joseph B. Miller and his wife, appellees, hereinafter referred to as Miller. Walston claimed when Miller's commodity account was closed out on April 15, 1957, Miller owed it $1,105.85. Miller counterclaimed alleging that Walston owed Miller a duty to timely notify Miller of certain information which might affect prices on the World Sugar Market. Miller claimed that this failure caused him to lose monies deposited by Miller with Walston in connection with trades and in addition, to lose certain profits. The trial judge, sitting without a jury, found in favor of Walston on its complaint in the sum of $1,105.85, and also found in favor of Miller on the counterclaim and awarded damages in the sum of $18,075.60.

From January 16, 1957 to April 15, 1957, Miller was engaged in the purchase and sale of sugar contracts on the World Sugar Market. The purchase or sale of a contract was done through Walston, and Walston was paid a fee of $35.00 for the handling of each separate contract. During this period, Miller spent much time in Walston's office studying Dow Jones averages, publications, and wire services provided by Walston.

On January 7, 1957, prior to the purchase of any contracts, Miller signed a management agreement with Walston outlining the terms under which Walston agreed to lend him a portion of purchase prices of various securities and commodities.

Miller claims that on three separate occasions Walston was negligent in either failing to advise or failing to give timely advice of certain information in the possession of Walston that directly affected the sugar contracts held by Miller. Specifically, on February 1, 1957, after the market closed, O'Neill, representative of Walston, phoned Miller and read to him a quote from Dow Jones' ticker to the effect that the International Sugar Council had noted the lifting of quotas on the exporting of sugar by member countries of the World Market. Miller and O'Neill discussed the

possibility of this causing the "bottom to drop out from under the sugar market". Miller claimed later that Steve Greenberg, commodity analyst of Walston's in New York, had information at that time which allegedly might have offset the mistaken inferences both he and O'Neill drew.

Next, Miller complains that Walston omitted to supply him personally with certain opinions and advice contained in the daily market letter of February 4, 1957, sent out by Greenberg to all Walston offices. Miller called Greenberg on February 5, and at that time, received all information known to Greenberg. Miller further complains that Walston failed to timely notify him of confirmation of the fact that Russia had purchased 200,000 tons of sugar on the World Sugar Market. The evidence in the case showed that the Phoenix office of Walston was sent a wire from Greenberg at 12:00 noon (Tucson time), April 10, concerning this fact; that at 12:50 P.M. of the same day, Miller called Greenberg and was told directly of this fact. The market had not closed but Miller took no action to protect his position.

These three events were only a few of the many factors affecting the market price of sugar during the period of January 7, 1957 to April 15, 1957. Not even Miller suggested that these events alone would have influenced all of his action. As he stated in his testimony he "got the facts and made up his own mind". Miller at no time sought nor paid for management of his account by Walston, nor did he entrust his affairs to them.

■ The main question to be resolved in this case was when, in fact, the principal-agent relationship was in existence. The trial court found as a fact that a fiduciary relationship between Walston and Miller was created by the signing of the margin agreement on January 7, and Walston's activities in handling the numerous contracts for Miller during the period from January 16 to April 15, 1957. There is no quarrel with the proposition of law that when a broker serves as a customer's agent, he is a fiduciary and owes his principal a duty to communicate certain information to him. This duty is outlined in the Restatement (Second), Agency § 381:

> "Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person".

■ The agency relationship between customer and broker normally terminates with the execution of the order because the broker's duties, unlike those of an investment advisor or those of a manager of a discretionary account are only to fulfill the

mechanical, ministerial requirements of the purchase or sale of the security or future contracts on the market. There was no claim by Miller that Walston did not properly handle all monies entrusted to it by Miller, or that Walston misrepresented any facts or in any way acted in bad faith toward Miller.

In Restatement (Second), Agency, § 106 the following appears:

"The authority of an agent to perform a specified act or to accomplish a specified result terminates when the act is done or the result is accomplished by the agent or by another * * *"

In Pacific Trading Co. v. Sun Ins. Office, 140 Or. 314, 13 P.2d 616, the court states:

"As a general proposition, a broker's duty is complete, and his authority ceases, when the sale is made and the receipts therefrom fully accounted for." 13 P.2d at 617.

See also Stern v. Forchheimer, 37 Misc.2d 648, 235 N.Y.S.2d 877; Security Options Corp. v. Shelton, 35 Misc.2d 741, 230 N.Y.S. 2d 950.

■ In the case of Clements v. R. J. Arrowsmith, Inc., 10 N.J.Misc. 944, 161 A. 837, the syllabus by the court reads as follows:

"1. Where there is no special relation of trust and confidence between a stockbroker and his customer, the broker is not liable for the customer's improvident speculations in stock bought through the broker."

See also Strassberg v. Lanborn, Hutchings & Co., 307 Ill.App. 546, 30 N.E.2d 795. This case demonstrates the fact that even to report price fluctuations alone would be so extremely burdensome an undertaking, that a contract to do so would have to be proven by clear evidence. It further indicates that, absent such a contract, there is no duty to furnish such information. If Walston owed such a duty to Miller, it follows that it owed such a duty to every other signatory of a margin agreement, and to all ordinary customers. Under these circumstances, any continuing duty to furnish all price information and information of all facts likely to affect the market price would be so burdensome as to be unreasonable.

■ While a broker and a customer have an agent-principal relationship with respect to each transaction to buy or sell, they may also have a separate and distinct continuing relationship as creditor and debtor. Such a relationship existed when the margin agreement was signed by Miller with Walston on January 7. When a broker exercises his ordinary functions in marginal transactions, he oftens acquires a dual personality. When he provides his own funds to complete the order, he becomes the creditor of the customer, and since he holds the customer's security as collateral, there is created between the customer and himself

the relation of pledgor and pledgee. The providing of these funds in no way makes the broker the agent of the customer. See also Richardson v. Shaw, 209 U.S. 365, 28 S.Ct. 512, 52 Law Ed. 835; In re Wittenberg's Estate, 202 Cal.App.2d 867, 21 Cal. Rptr. 258; Hunt v. Rosenbaum Grain Corporation, 355 Ill. 504, 189 N.E. 907; Hadfield v. Tracy, 101 Conn. 118, 125 A. 199, 34 A.L.R. 581; In re Mercantile Trust Co., 210 N.Y. 83, 103 N.E. 884; Lamprecht v. State, 84 Ohio St. 32, 95 N.E. 656; Meyer, The Law of Stock Brokers & Stock Exchanges, pp. 253–255. The result is that at the time of each of the acts complained of by Miller, there was no "fiduciary relationship" between the parties. If there existed no relationship between the parties to create a duty, then there could be no breach of that duty and consequently no negligence.

Judgment of the trial court is reversed and it is further ordered that judgment be entered for appellant.

BERNSTEIN, V. C. J., and UDALL, LOCKWOOD and McFARLAND, JJ., concurring.

NOTE: Chief Justice STRUCKMEYER, having disqualified himself, the Honorable MARY ANNE RICHEY, Judge of the Superior Court of Pima County, Arizona, was called to sit in his stead and participate in the determination of this appeal.