**Carl R. ROBINSON, Plaintiff,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant.**

**Civ. A. No. 69–600.**

United States District Court,
N. D. Alabama, S. D.

April 15, 1971.

---

Roscoe B. Hogan, Hogan, Roach & Smith, George S. Brown, Birmingham, Ala., for plaintiff.

N. Lee Cooper, Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

McFADDEN, District Judge.

Plaintiff, a practicing physician and attorney, seeks to recover $48,000.00 from his broker for losses incurred in trading commodity future contracts of pork bellies and hogs, which it is contended resulted from defendant's negligent failure to advise him of material market information. Specifically, plaintiff claims that while he was the owner of fourteen short contracts in pork bellies and four short contracts in hogs, purchased through defendant, a report of the United States Department of Agriculture indicating a shortage in these commodities came into defendant's hands, and defendant negligently failed to so advise plaintiff, who continued to hold his short contracts with the consequent loss of invested money, lost profits, commissions and interest on invested money. Defendant counterclaims for the sum of $912.00 for balance due upon liquidation of plaintiff's account with defendant.

Plaintiff opened a commodity account with the defendant in December of 1957 and traded commodities with defendant until September 30, 1969. Plaintiff speculated in various commodity future contracts of beans, cocoa, cotton, sugar, rubber, copper, potatoes, cottonseed oil, eggs, cattle and broilers and was in daily contact with the market through his broker and otherwise.

From June 2, 1969, through August 20, 1969, plaintiff closed 74 separate commodity positions in cattle, eggs, broilers, cocoa, pork bellies and hogs through de-

fendant's Birmingham office resulting in a total net profit of $8,208.25. On August 20, 1969, plaintiff maintained a short position in four contracts of February pork bellies and in four contracts of December hogs.

Short positions in four more February pork belly contracts on August 27, and two additional February pork belly contracts on August 28, August 29, September 3 and September 17, respectively, resulted ultimately in short positions on sixteen commodity future contracts of February pork bellies. Plaintiff also shorted two more December hog contracts on September 17, and six additional December hog contracts on September 22, resulting in a total short position of twelve December hogs commodity future contracts.

On September 11, 1969, at 10:48 a. m. (Birmingham time), the Birmingham office of Merrill received the following wire from Merrill's commodity headquarters in New York:

"TO ALL OFFICES                                          September 11, 1969
NOT TO BE DISTRIBUTED TO CUSTOMERS          Time 10:48 A.M.

Opinion Change—No. 66 Pork Bellies

Would buy February contract in the 3800–3835 range only—see footnote.

1.  While longer term outlook is for expanded supplies expect smaller slaughter from now until the end of the year to result in light storings against the February contract.

2.  Expect September 19, 10 state pig report to confirm this lighter slaughter perhaps not to the same extent as the June report which indicated a possible reduction of 8 percent, but to be still bullish.

3.  Storage holdings of pork items, bellies, hams and loins are at low levels even for this normally low time of year.

4.  Keep positions modest as this could be just a trading turn and the 9/19 pig report will be critical.

Footnote—All opinions are day orders unless specified otherwise

OBJ 300–500 pts risk 75–125 pts
1 pt equals $3 margins $1000/700"

———◆———

This wire recommends the purchase of February pork belly contracts at certain prices and gives some indication of what eventually happened. The wire states that the September 19 ten-state pig report is the "critical" factor affecting the price of February pork belly contracts and further predicts that the September 19 report will be "bullish", which in trade parlance means the report will cause the price of February pork belly contracts to rise. The report anticipated the cold storage report which was to be released on September 17 by the statements that the storage holdings were at "low levels even for this normally low time of year," and "expect smaller slaughter from now until the end of the year to result in light storings against the February contract." The recommendation to buy and the other data were contrary to plaintiff's short position in the market.

Plaintiff testified that he could not specifically recall whether he read the September 11 wire, but did not deny seeing it. He was in defendant's Birmingham office during the morning of September 11, and did read a commodity wire from defendant's commodity head-

quarters in New York. Two of defendant's Birmingham account executives testified that they were present when the September 11 wire was handed to plaintiff and that he read it. The same witnesses stated that this was the only wire concerning pork bellies received by defendant's Birmingham office on September 11, 1969.

Plaintiff entered a price-limiting order on September 11, 1969, to close or cover his then outstanding short position of fourteen February pork belly contracts at a price of 38.40 or lower (Defendant's Exhibit 5). However, the lowest trade in pork bellies on September 11 was at a price of 38.42 (Plaintiff's Exhibit 21), and therefore plaintiff's order was not executed due to the price limit.

Plaintiff made no additional attempts to cover or close his short position in pork bellies until September 23, but conversely increased his short position by shorting two additional February pork belly contracts on September 17.

The United States Department of Agriculture (USDA) released a monthly cold storage report after the close of the commodity market on September 17, 1969. These reports are released on a monthly basis by USDA and estimate the amount of pork bellies in storage as of the first day of each month, or in this case September 1, 1969. The September 17 cold storage report estimated that with the exception of 1966 the September 1 storings were the smallest for the previous six years. Plaintiff bases his case on the alleged negligent failure of defendant to inform him of the information in this report and testified that he would have closed his short position if this had been done.

There is a conflict in the testimony as to when plaintiff received this information, plaintiff contending it was September 23, and defendant's witnesses asserting that the information was communicated to plaintiff by telephone on September 17, 1969.

This issue becomes immaterial in light of the uncontradicted evidence that the September 17 cold storage report had little, if any, effect on the price of pork bellies, and no effect on the price of hogs.

The average market price of pork bellies (Plaintiff's Exhibit 21) and hogs (Plaintiff's Exhibit 20) dropped slightly on September 18, 1969, the first trading day after the release of the cold storage report, which indicates that if the cold storage report did exert any market influence it was favorable to the plaintiff's short positions.

The quarterly ten-state pig report was released by the United States Department of Agriculture after the close of the market on Friday, September 19, 1969. The following Monday, September 22, the market in commodity contracts of both hogs and pork bellies was up the permissible limit, preventing anyone from covering or closing outstanding short positions. All commodity future contracts have maximum daily price fluctuations imposed by the commodity exchange and if the price of the commodity contract goes up to the maximum permitted limit, outstanding short positions are unable to buy commodity contracts to cover or close the short positions. Due to the maximum daily price fluctuation, plaintiff was unable to cover his outstanding short position in pork bellies until Tuesday, September 23.

Plaintiff received the pig report information on September 23, but continued to maintain his short position in December hogs until September 30, 1969.

Plaintiff's account was liquidated on or about September 30, 1969, to cover margin demands and upon final liquidation there was a balance owing defendant of $912.00 (Defendant's Exhibit 2).

Plaintiff contends that defendant as a commodities broker was under a duty to communicate to him information which would affect his position in the market and must answer in damages for a failure to do so.

When a broker serves as a customer's agent, he has certain duties, just as in any principal-agent relationship. Under an agency relationship the principal owes

a duty to communicate certain information to his agent. This duty is outlined in the Restatement of Agency, 2d at § 381:

Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person.

■ Agency is a consensual relationship, and the agency or broker-customer relationship in a cash transaction does not come into existence until the order has been placed and the broker has consented to execute it. Le Marchant v. Moore, 150 N.Y. 209, 44 N.E. 770 (1896).

■ The agency relationship did not arise until the plaintiff placed an order, since defendant did not have discretionary or managerial power over plaintiff's account and therefore had no authority to act for the plaintiff without express direction. Little & Hays Inv. Co. v. Pigg, 29 Ky.Law Rep. 809, 96 S.W. 455 (1906); Hopkins v. Clark, 158 N.Y. 299, 53 N.E. 27 (1899).

A broker's office, without special circumstances not present here, is simply to buy and sell. The office commences when the order is placed and ends when the transaction is complete. The risk of the venture is upon the customer who profits if it succeeds and loses if it fails. When the transaction is closed in accordance with the understanding of the parties, the broker gets only his commission and interest upon advances. Richardson v. Shaw, 209 U.S. 365, 28 S.Ct. 512, 52 L.Ed. 835 (1908); Restatement of Agency, 2d § 106.

Walston & Co. v. Miller, 100 Ariz. 48, 410 P.2d 658 (1966), is factually close to the instant case. There Miller alleged that Walston owed a duty to notify him in a timely manner of certain information which might affect prices on the world sugar market, and further claimed that this failure to give timely notification caused his loss in commodity contracts of sugar. Miller alleged that on at least three separate occasions Walston was negligent in either failing to advise or failing to give timely advice of certain information in the possession of Walston that directly affected the sugar contracts held by Miller.

The appellate court reversed the trial court's judgment rendered for plaintiff, ordered that judgment be entered for the defendant, and stated:

The agency relationship between customer and broker normally terminates with the execution of the order because the broker's duties, unlike those of an investment advisor or those of a manager of a discretionary account, are only to fulfill the mechanical, ministerial requirements of the purchase or sale of the security or future contracts on the market. . . .

410 P.2d at 661.

In Pacific Trading Co. v. Sun Ins. Office, 140 Or. 314, 13 P.2d 616 (1932), the court stated at p. 617:

As a general proposition, a broker's duty is complete, and his authority ceases, when the sale is made and the receipts therefrom fully accounted for.

■■ The relationship of agent and principal only existed between plaintiff and defendant when an order to buy or sell was placed, and terminated when the transaction was complete. That is, defendant was a broker and nothing more. It then becomes clear that defendant's duty, in the language of § 381 of the Restatement of Agency 2d quoted above, is a duty to "use reasonable efforts" to give the principal information relevant to the affairs entrusted to it. The affair entrusted to a broker who is to buy or sell through an exchange is to execute the order, not to discuss its wisdom.

The result is that at the time of the acts complained of in the present case, there was no "fiduciary relationship" between the parties and there was, accordingly, no breach of duty arising from such relationship.

■ Under ordinary circumstances a broker is under a duty to execute the order given to him within a reasonable time. However, margin agreements have been interpreted as an undertaking by the broker, should an agency thereafter be created by placing of an order, to execute such order "at once." Markham v. Jaudon, 41 N.Y. 235, 239 (1869).

■ In certain circumstances, the duration of the principal-agent relationship may be prolonged because the order to buy or sell cannot, because of its terms, be executed for an extended period of time. A common situation would be that in which a customer instructs a broker to buy or sell a specified contract or security at a certain price or when the market goes above or below a certain price. The occurrence may not happen for a considerable time; during the interval a principal-agent relationship exists between customer and broker.

■■ Even where an extended agent-principal relationship does exist between a broker and customer because of delay in execution, the broker has no duty to relay news of political, economic, weather or price changes to his principal, absent an express contract to furnish such information. The courts will not permit recovery on alleged contracts to supply either managerial supervision of an account or detailed information as to market price changes in the absence of such contracts and have held that testimony as to the existence of such a contract was inherently incredible and that clear evidence of such a contract would be necessary to overcome the unlikelihood of such an agreement under the circumstances. Where there is no special relationship of trust and confidence between a stockbroker and his customer the stock broker is not liable for improvident speculation. Strassberg v. Lamborn, Hutchings & Co., 307 Ill.App. 546, 30 N.E.2d 795 (1940); Wemple State Bank v. Continental Illinois Co., 279 Ill.App. 224 (1935).

In Walston & Co., Inc. v. Miller, supra, the Court said:

. . . [E]ven to report price fluctuations alone would be so extremely burdensome an undertaking, that a contract to do so would have to be proven by clear evidence. . . . Absent such a contract, there is no duty to furnish such information. If Walston owed such a duty to Miller, it follows that it owed such a duty to every other signatory of a margin agreement, and to all ordinary customers. Under these circumstances, any continuing duty to furnish all price information and information of all facts likely to affect the market price would be so burdensome as to be unreasonable.

410 P.2d at 661.

There was no pleading or proof of an express contract or special circumstances which required defendant to transmit to plaintiff the extrinsic facts or opinions in any way related to the market in question. Such a duty existing in the absence of a specific contract would be owed to every signatory of a margin agreement, whether or not he ever placed an order to buy or sell. The magnitude of this duty would be staggering in view of the testimony that each account executive has hundreds and possibly several thousand customers and would be so grossly burdensome as to be patently unreasonable.

The proposition becomes even more untenable when one attempts to analyze the claimed duty to inform. Plaintiff contends that he was entitled to know the significant facts. What are the significant facts? Does a broker have the responsibility to transmit every fact although it is only one of a myriad of facts which might have some bearing on the market? If a broker were under a duty to inform all of its customers of every fact which might bear upon any security held by the customer, the broker simply could not physically perform such a duty.

The complexity and variety of the factors affecting price are so great that any attempt to cast upon the broker the duty to determine, at his peril, which facts are relevant to each customer in

each commodity would make the broker an insurer for the trader. Clearly the relationship was not intended as such.

To make this defendant or any other broker the guardian of a customer such as the plaintiff would destroy an important part of the marketplace. In every case a trader could recover damages from his broker merely by proving non-transmission of *some* fact which, he could testify with the wisdom of hindsight, would have affected his judgment had he learned of it.

Under these circumstances any continuing duty to furnish all price information and information of all facts likely to affect the market price would be so burdensome as to be unreasonable, and neither logic, reason nor common sense would impose such a continuing duty.

[9] Under certain circumstances, a duty to communicate information may exist from the time of signing of the margin agreement, as in the case of an actual investment advisor as opposed to a mere broker. Giving investment opinion and advice in return for compensation is a major economic activity, specialized enough to have given rise to specific Federal statutory regulations, *i. e.*, Investment Advisors Act of 1940, 15 U.S. C.A. § 80b–1.

Generally, however, investment advisors are responsible only for making recommendations based upon their own business judgment and are not responsible for learning, let alone transmitting, all information which could influence market prices.

An agreement to undertake investment advisory responsibilities must be pleaded and proven with the same degree of certainty as any other claim arising out of an express contract, and failing such proof there is no liability. Clements v. R. J. Arrowsmith, Inc., 10 N.J.Misc. 1009, 161 A. 837 (N.J.Ch., 1932); Strassberg v. Lamborn, Hutchings & Co., 307 Ill.App. 546, 30 N.E.2d 795 (1940); Stern v. Forchheimer, 37 Misc.2d 648, 235 N.Y.S.2d 877 (N.Y. County, 1963),

aff'd 42 Misc.2d 98, 247 N.Y.S.2d 518 (App. Dep't 1964).

In Minez v. Merrill, 237 App.Div. 760, 264 N.Y.S. 266 (1933), even an allegation that plaintiff

. . . and defendant stockbrokers entered into a contract for expert and special advice concerning the management of a stock account plaintiff had with defendants, and that . . . by reason of defendants' breach thereof plaintiff has been damaged to the extent of $1,000,000

was dismissed as defectively vague.

The defendant here was a broker with respect to plaintiff, and any investment advice was incidental to brokerage services. Defendant denies that any investment advice was given with respect to commodity trading and in fact contends the opposite because of the speculative nature of the business. The defendant here was not an investment advisor and had no fiduciary relationship to the plaintiff which required relaying of any market information. Where the broker-dealer is also an investment advisor he does occupy a fiduciary relationship. In re Arleen W. Hughes, 27 S.E.C. 629 (Feb. 18, 1948), aff'd Hughes v. S. E. C., 174 F.2d 969 (D.C. Cir. 1949), the Commission stated at p. 639:

. . . We emphasize that it is not intended that the disclosure requirements, which we have found applicable to registrant, be imposed upon broker-dealers who render investment advice merely as an incident to their broker-dealer activities unless they have by a course of conduct placed themselves in a position of trust and confidence as to their customers.

Even in broker-dealer cases, where dealer activities impose greater duties than would otherwise rest on a mere broker, courts have held that absent an express investment advisory contract there is no fiduciary duty unless the customer is infirm or ignorant of business affairs. The instant defendant, of course, was only a broker and not a broker-dealer, in its transactions with the

plaintiff; that is, it was not selling future contracts owned by itself, only executing the plaintiff's orders on an open market.

The Court concludes therefore that defendant had no duty to disclose the market information, that in any event it did so in a reasonable and timely manner, and that therefore it is not liable to plaintiff.

Accordingly, judgment will be rendered for the defendant on plaintiff's claim and against plaintiff on defendant's counterclaim. All costs are to be taxed against plaintiff.