**Kay A. CANDELORA, Plaintiff,**

**v.**

**Harold A. CLOUSER, Jr., and Merrill, Lynch, Pierce, Fenner & Smith, Inc., Defendants.**

**Civ. A. No. 83–419–JLL.**

United States District Court, D. Delaware.

Oct. 28, 1985.

James F. Kipp of Trzuskowski, Kipp, Kelleher & Pearce, Wilmington, Del., and Erv D. McLain of Maloney & Danyi, Bethlehem, Pa., of counsel, for plaintiff.

Walter L. Pepperman, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants.

## OPINION

LATCHUM, Senior District Judge.

This diversity action [1] is presently before the Court on a renewed motion for summary judgment by the defendants, Harold A. Clouser, Jr. ("Clouser"), and his employer, Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), pursuant to Fed.R. Civ.P. 56. The plaintiff, Kay A. Candelora ("Candelora"), alleges fraud perpetrated by Clouser in concert with a certain James S. Ryan ("Ryan") to defraud her of $110,000. (Docket Item ["D.I."] 1.) She seeks judgment for that amount as well as damages for physical and emotional pain and suffering, and medical expenses caused by the alleged fraud, negligence and intentional infliction of emotional distress arising out of Candelora's opening and maintenance of an account at Merrill Lynch. Ryan, the key figure in this case, actively appropriated and absconded with plaintiff's assets, but has been dismissed for lack of service.[2] This Court previously denied defendant's first motion for summary judgment on February 20, 1985 (D.I. 41), because of possible inferences arising from the relationship between Ryan and Clouser. Because the production of further evidence requested by the Court and further briefing by the parties has resolved the Court's concern, the defendant's renewed motion for summary judgment will be granted.

## BACKGROUND

Plaintiff Candelora is a forty-seven year old woman who lives in Shamokin, Pennsylvania. (D.I. 25, 5–6.) Although plaintiff dropped out of high school in her junior year due to a "nervous condition," she subsequently passed a GED test and received her high school diploma in 1970. (*Id.* at 14–15.) About a year after she left high school, plaintiff performed secretarial work for approximately two years in a department store in Shamokin. (*Id.* at 9–11.) After that job, she worked at different times as a shirt presser in an Arrow shirt factory in Shamokin, as an aide in the diet department at the Danville State Hospital in Danville, Pennsylvania, and as a receptionist for the Pennsylvania State Welfare Department at its office in Shamokin. (*Id.* at 10–13.)

Plaintiff was married from 1958 to 1967. (D.I. 25, 6.) She has two children, ages 23 and 21, both of whom are currently in the Armed Services. (*Id.* at 7, 37.) In 1964 plaintiff had a nervous breakdown due in part to the deteriorating condition of her marriage. (*Id.* at 30.) As a result of the breakdown, she was hospitalized for some time at the Allentown General Hospital and received psychiatric care from a Dr. C.D. Elliott. (*Id.* at 30–31.) Plaintiff has remained under Dr. Elliott's care on an off-and-on basis since 1964. (*Id.* at 32.) She was again hospitalized for approximately three weeks by Dr. Elliott in 1977 or 1978 at the Bethlehem Pennsylvania Hospital for depression. (*Id.* at 32–33.) Plaintiff was last hospitalized in 1982 in Charlottes-

1. Jurisdiction exists under 28 U.S.C. § 1332 because the plaintiff is a citizen of Pennsylvania (Docket Item ["D.I."] 1) while the defendant Merrill Lynch is a corporation incorporated under the laws of the State of Delaware with its principal place of business in New York (D.I. 1, 11) and defendant Clouser is a Delaware citizen (D.I. 40).

2. In the complaint filed on July 1, 1983, plaintiff named as defendants Clouser, Merrill Lynch, and Ryan, a private detective. (D.I. 1.) Although Clouser and Merrill Lynch were served, Ryan was not. On February 10, 1984, this Court issued a rule to show cause why the case should not be dismissed as to Ryan pursuant to Fed.R. Civ.P. 4(j). (D.I. 16.) On February 28, 1984, at

the hearing on the rule to show cause, plaintiff's counsel informed the Court that he had been unable to find Ryan to perfect service; therefore he requested additional time to attempt to perfect service. (The attempts made to perfect service on Ryan included sending the complaint via certified mail to Ryan's last known address, Port Jervis, New York, and Pequot Lake, Minnesota, as well as an attempt at personal service by a private investigator retained by plaintiff's counsel.) Although the Court granted plaintiff three additional months to attempt to serve Ryan, service was not made. Therefore, on August 31, 1984, this Court entered an order dismissing, without prejudice, Ryan as a defendant in this case. (D.I. 27.)

ville, Virginia, under Dr. Elliott's care for approximately six weeks, again due to depression. (*Id.* at 33–35.)

In 1979, Candelora received $215,000[3] worth of bearer bonds as a gift from a Frederick E. Lark. (D.I. 25, 17–18.) Mr. Lark, the attorney who handled Candelora's 1967 divorce, gave the bearer bonds as well as some gold coins and a $2,000 gold ring to Candelora for the "security" of plaintiff and her family. (*Id.* at 18.)[4] Although Mr. Lark had been a friend of Candelora's for some time, his generosity resulted in controversy. (*Id.* at 20–21.) Mrs. Lark demanded the return of the gifts, and there was a suggestion that criminal charges were going to be filed against Candelora in connection with these gifts. (*Id.* at 23.) However, no litigation ever resulted, and Candelora did not return any portion of the gifts to the Larks. Mr. Lark was institutionalized in a nursing home for a period of time after he gave Candelora the gifts. (*Id.* at 20–22.) In June, 1984, at the age of seventy, Mr. Lark died. (*Id.* at 125.)

In April 1980, Candelora, on the advice of her attorney, Thomas J. Maloney,[5] took the bonds to the First National Bank of Palmerton ("Palmerton Bank") (D.I. 25, 43–44), and instructed the bank to sell the bonds and establish a Certificate of Deposit ("C.D.") with the proceeds. (*Id.* at 79–81; D.I. 35A at A-125, 128–29.) On May 9, 1980, Candelora purchased a $110,000 C.D.[6] with interest in excess of $900 a month. (D.I. 25, 65.) Because Candelora had left her job with the Department of Welfare

when she received the gift from Lark in 1979, the interest from the C.D. was her only source of income. (*Id.*)

In May of 1980, Candelora purchased a new Oldsmobile from an automobile dealer in Ashland, Pennsylvania. (D.I. 25, 47.) Approximately six weeks later, she returned the car to the dealer because it had been the object of vandalism. (*Id.* at 48.) Apparently, this vandalism was one incident in an ongoing series of events that began in 1978 and continued into 1980. (*Id.* at 35.) Candelora believed that a former boyfriend was committing the vandalism. (*Id.* at 26–27.)

Candelora spoke to the Oldsmobile car salesman about the vandalism she had experienced, and he suggested that she discuss the matter with a private detective named James S. Ryan ("Ryan") from the Francis E. Ryan Agency in York, Pennsylvania. (D.I. 25, 49–50.) In the last week of June 1980, Candelora telephoned Ryan and subsequently hired Ryan to find out who was vandalizing her car. Candelora gave Ryan a $500 retainer and agreed to pay him $15 per hour for his services. (*Id.* at 52–53.)

Ryan began investigating on July 4, 1980. Ryan spent two weeks at Candelora's house, "standing in the front door" and watching her cars,[7] but he failed to discover anything concerning the vandalism. At that point, Candelora, having decided that she could no longer afford to pay Ryan, terminated his services and paid him $2,500. (D.I. 25, 181–82.) Approximately a week and a half later, Ryan telephoned

---

3. The $215,000 figure was the value of the bonds at maturity. (D.I. 25, 64.)

4. At her deposition, Candelora stated that she and Lark had been friends for "quite some time" but that she did not have a "sexual relationship" with him. (D.I. 25, 20, 22.)

5. Candelora stated that Maloney had been her attorney since 1977 or 1978 and that, to her knowledge, Maloney had no professional connection or affiliation with Lark. (D.I. 25, 43–44.)

6. On April 22, 1980, the Palmerton Bank received from Candelora bonds in the amount of $150,000. (D.I. 35A, A-125.) When the bank

cashed the bonds, the proceeds ($122,195.96) were deposited in Candelora's savings account at the Palmerton Bank. (D.I. 25, 81.) On May 9, 1980, $110,000 was withdrawn and put into a C.D. Although Candelora testified at deposition that the full proceeds of the bonds were used to purchase the C.D., there was $12,195.96 remaining in the account which was withdrawn by the plaintiff in four installments in the succeeding three months. (D.I. 35A, A-129.)

7. Candelora owned two cars, a VW and a Chevette, in addition to the Oldsmobile, that were also vandalized. (D.I. 25, 47.)

Candelora "to see if everything was all right." (*Id.* at 55.) Candelora told him that she had found "some tacks sprinkled around outside." (*Id.*) Ryan then began stopping by to see Candelora on a regular basis "to check on things." Ryan also began to ask Candelora a lot of questions which kept her constantly afraid. Ryan soon became Candelora's "confidant and advisor." She saw him on a daily basis, and in August 1980, she became personally and sexually involved with him.[8] (*Id.* at 57.)

In December 1980 or January 1981, Ryan suggested to Candelora that she should cash her C.D. to prevent the Larks from getting the funds and in order to make more money. (D.I. 25, 71.) On February 9, 1981, Ryan went with Candelora to Palmerton Bank where she cashed the $110,000 C.D. (*Id.* at 82–83.) A $5,575 penalty was assessed against her for cashing the certificate early, leaving a balance of $104,425. Candelora received these proceeds in the form of a cashier's check for $64,425 and $40,000 in cash which was handed to Mr. Ryan. (*Id.* at 83–84.) Candelora and Ryan then drove with the proceeds to Wilmington, Delaware, to the Wilmington Trust Company on February 10, 1981, where Candelora opened a checking account solely in her name and deposited into that account (a) the endorsed Palmer-

ton cashier's check for $64,425 together with cash of $75 for a total of $64,500, and (b) a second deposit of $200 in cash. (D.I. 53.) Thus, on February 10, 1981, Candelora had deposited only $64,700 with Wilmington Trust.[9]

Afterwards, Candelora and Ryan went to the offices of Merrill Lynch in Wilmington. Ryan went into the offices alone while Candelora waited outside the building because of Ryan's warning that she might be recognized.[10] (*Id.* at 88.) This scenario would become routine. Candelora also testified at deposition that she gave Ryan a check drawn to cash for the full amount which she had deposited in Wilmington Trust. (*Id.* at 88–89.) Plaintiff's recollection was again faulty as she did not draw a check for cash in the amount of $64,000 from her Wilmington Trust account until February 24, 1981. (D.I. 53.)

When Ryan entered the offices of Merrill Lynch, he met with Harold A. Clouser, a stockbroker employed by Merrill Lynch. (D.I. 36.) Ryan had met Clouser in 1980 because their wives had gone to school together. (D.I. 25, 135.) Between 1980, when Clouser first met Ryan, and February 1981, when Ryan came to see Clouser at Merrill Lynch's offices, Clouser had seen Ryan five or six times on social occasions. As a result of those contacts, Clouser be-

---

**8.** During this period Ryan was married and living in Ashland, Pennsylvania. (D.I. 25, 47.) At no time did Ryan and Candelora live together in Shamokin. (*Id.* at 57.)

**9.** Candelora testified at her deposition that she had deposited the entire sum of $104,425 received from the Palmerton Bank in Wilmington Trust Co. (D.I 25, 85.) The Wilmington Trust records show her testimony to be totally incorrect because of the $40,000 received from the Palmerton Bank in cash, only $275 cash was deposited to her Wilmington Trust Company account. (D.I. 53.) Apparently $39,725 of the cash received from the Palmerton Bank was retained by Ryan.

In her deposition, Candelora also claimed that she and Ryan drove to Wilmington and made the deposit in Wilmington Trust on the same day that she withdrew the proceeds from the Palmerton Bank. (D.I. 25, 84.) However, here, too, her memory must have failed her because the bank statements show that she withdrew the

money from the Palmerton Bank on February 9, and deposited the $64,700 in Wilmington Trust on February 10. (D.I. 53.)

**10.** Candelora contends that she did not enter the offices of Merrill Lynch because Ryan told her that she "should not be seen going in there." (D.I. 35, 91.) Candelora also argues that she "couldn't" go in because "[h]e [Ryan] made the decisions what I was going to and what I was not going to do [and] he said it would be better that [sic] nobody could ever describe me or recognize me if I walked in there at some other time." (*Id.* at 93.) Ryan's statements to Candelora were apparently a "suggestion" that the Larks would find out where the proceeds of the C.D. were being invested.

Again, plaintiff's confused testimony on the dates of her deposits and withdrawals is incorrect. The Merrill Lynch statements (D.I. 54, Ex. 5) show that the account was opened on February 10, not on the next day, as plaintiff recounts in her deposition. (D.I. 25, 87.)

came aware that Ryan was a private detective who worked for his father's agency in Pennsylvania. (D.I. 36, ¶ 3.) At this February 10 meeting, Ryan told Clouser that Candelora was one of his clients and that Candelora had asked Ryan to open an account for her in her name. Clouser agreed to open a non-discretionary cash account in Candelora's name.

Although Candelora testified that it was her understanding that the purpose of Ryan's visit to the Merrill Lynch office on February 10 was to invest the proceeds from the C.D., Ryan only gave Clouser $35,500 to open a Merrill Lynch Ready Asset Account. (D.I. 54, Ex. 7–6.)[11] In addition to deposits in the Ready Asset Account, on that date Ryan also for $340 in cash directed Merrill Lynch to purchase 4,000 shares of Permaloy Corporation for Candelora's account. (D.I. 54, Ex. 6.) Thus, as of February 10, 1981, a total of $35,850.00 in cash was invested by Ryan with Merrill Lynch in Candelora's account. (D.I. 54, Ex. 6.)

When Ryan came out of Merrill Lynch's office, he told Candelora that he had invested the money in an account in her name. (D.I. 25, 94.) They then drove back to Shamokin.

Approximately two weeks later, on February 24, 1981, Candelora by drawing a check to cash withdrew from her Wilmington Trust account $64,000[12] (D.I. 53), and these proceeds were again turned over to Ryan who on February 25, 1981, deposited only $50,000 of that cash into Candelora's Merrill Lynch account (D.I. 54, Ex. 6), bringing a total of cash deposits into Candelora's Merrill Lynch account of $85,840. (D.I. 54, Ex. 6.)

From February 1981 to November 1981, a number of transactions occurred in Candelora's Merrill Lynch account, each in the same manner. Ryan would contact Clouser and tell him to either purchase or sell a particular stock. In accordance with Ryan's requests, money was transferred either to or from Candelora's account. Each request was made in Candelora's name but through Ryan. Both the transfer of funds to or from the account and any transactions concerning stocks were confirmed to Candelora by means of contemporaneously written transaction slips mailed to Candelora's home address and by means of the regular monthly statements of Candelora's general account which were mailed to her residence in Shamokin. (D.I. 54.) That monthly statement contained a complete summary of all of Candelora's financial transactions during the previous month. (D.I. 36, 54.) In addition, a third, separate monthly statement solely for Candelora's Ready Asset Account was also sent to her home at the end of each month which showed the account's beginning balance, the date, the amount of all withdrawals during that month and the ending balance. (D.I. 36, 6; D.I. 54.)

At the beginning of April 1981, Ryan contacted Clouser and told him that Candelora needed $27,000 and that she wished to remove that amount from her Ready Asset Account. (D.I. 36, 5; D.I. 54, Ex. 10.) In accordance with that request, Clouser directed that a check be issued to Candelora in the amount of $27,000.84. (The 84 cents was the balance in Candelora's general account at that time [D.I. 36, ¶ 21].) On or about April 2, 1981, Candelora and Ryan drove to Wilmington to pick up the check. (D.I. 25, 112, 133–34.) When they arrived at the Wilmington Merrill Lynch office, Ryan went inside, and once again Candelora waited outside pursuant to the same instructions Ryan had given her when the account was opened. Ryan came out of the office and handed Candelora a Merrill Lynch check made out to her in the amount of $27,000.84. Plaintiff and Ryan immediately went to Wilmington Trust where

---

**11.** The $35,500 cash deposit in Candelora's Ready Cash Account undoubtedly was part of the $39,725 cash retained by Ryan (*see* footnote 9) which came from the $40,000 in cash received from the Palmerton Bank.

**12.** After the cash check for $64,000 was withdrawn from her Wilmington Trust account, Candelora then had a balance in that account of $833.92. (D.I. 53.)

plaintiff endorsed the check and cashed it. (*Id.* at 113, 155–56.) Candelora kept $2,000 from the proceeds of that check and gave the rest to Ryan, also following his instructions. (*Id.* at 114.)

Ryan subsequently made seven other requests on behalf of plaintiff for withdrawals from plaintiff's Ready Asset Account. (D.I. 36, 6; D.I. 54, Ex. 10.) In each case, the requested amount was withdrawn from Candelora's Ready Asset Account and a Merrill Lynch check was issued to her personally. (D.I. 54.) All checks were made out to Candelora only, and were mailed to Candelora at her home in Shamokin. (*Id.*) Each of these checks was received by Candelora, personally endorsed, and cashed by her. (D.I. 25, 155, 160–63; D.I. 54, Ex. 13–22.)

After Candelora cashed each of the Merrill Lynch checks, she gave all of the proceeds to Ryan, except for what she needed in order to pay bills. Candelora claimed that she kept only approximately $1,000 per month from the checks that were cashed, or a total of approximately $8,000 or $9,000. In addition, Candelora gave Ryan the diamond ring and gold coins she had received from Mr. Lark. Although she took those items out of a safety deposit box and gave them to Ryan for "safe-keeping," she does not know what happened to them. (D.I. 25, 182–86.)

Candelora admits that all of the transaction slips, Merrill Lynch monthly account statements and Ready Asset Account statements were addressed to her at her correct home address in Shamokin and that Ryan "now and again" showed her statements from Merrill Lynch with certain items circled on the statement which he attempted to explain to her. (D.I. 25, 108–11, 145, 149.) Candelora also stated that she endorsed the checks from Merrill Lynch which came in the mail. (*Id.* at 164.)

In the fall of 1981, Candelora's personal relationship with Ryan deteriorated to the point that it ended in September or October. (D.I. 25, 57.) Candelora became suspicious of Ryan and his dealings with her money. (*Id.* at 58.) Candelora "realized something wasn't right [and that] something was going on." (*Id.*) These suspicions were confirmed in November 1981 when Ryan, after questions by Candelora concerning her finances and her threats to go to Merrill Lynch, told her that she was "broke." (*Id.* at 58.) At that point Ryan actually threw all the Merrill Lynch statements at Candelora.

Until the time when Ryan threw the Merrill Lynch statements at Candelora, she was unaware of Clouser's last name because Ryan referred to Clouser only as "Harold, Jr." (D.I. 25, 102.) However, when Candelora looked at some of the Merrill Lynch statements, she discovered Clouser's last name. (*Id.*) She then called Clouser and spoke with him for the first time in November 1981 "to see if he could explain what happened," because plaintiff "didn't think (she) was broke." (*Id.* at 103.) Plaintiff visited Clouser at his Merrill Lynch office; only then did she realize the extent of her loss.[13] Clouser answered all her questions (*id.* at 119), and was "very upset." (*Id.* at 133.) Plaintiff only had Permaloy stock left. (D.I. 35, 2.)

Concerning the period beginning when she met Clouser in November 1981, plaintiff admitted that she had no complaints concerning his performance with respect to her accounts. (D.I. 25, 120–21.) Plaintiff also stated that she "wasn't doing (her) own thinking" prior to her meeting with Clouser and that Ryan was "doing everything" for her. (*Id.* at 130, 132.) In fact, Ryan instructed plaintiff—even threatened in some cases—not to call Merrill Lynch. (*Id.* at 138–39.)[14]

---

**13.** Initially, a total of $85,840 was placed in Candelora's Ready Asset Account in February, 1981. Although $13,799 had been taken out of the account to purchase stock, the balance, as well as all the dividends earned and credited to her account (approximately $75,000) was grad-

ually withdrawn from the Ready Asset Account between April 2, 1981 and October 5, 1981, with checks payable to Candelora. (D.I. 54.)

**14.** Candelora described how Ryan played on her nervous state and attempted to increase her apprehensions. The main reason she never

# LAW

## A. *Choice of Law*

In a diversity case, a federal court sitting in Delaware must apply the substantive rules of Delaware, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including its choice of law rules. *Klaxon Co. v. Stentor Electric Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Delaware law governs the disposition of plaintiff's claims against the defendants. The alleged torts occurred in Delaware, where the offices of the defendant are located. Delaware law is well established that the place of wrong controls (*lex loci delicti*). *Friday v. Smoot*, 211 A.2d 594 (Del.1965); *see Burke v. Elliott*, 606 F.2d 375 (3d Cir.1979).

## B. *Defendants' Renewed Motion For Summary Judgment*

In order to be entitled to a summary judgment, a moving party must demonstrate that there is no issue as to any material fact in the case and is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In ruling on this motion, the Court must draw all inferences from the existing record in a light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

Although the moving party bears the initial burden on the motion, the non-moving party bears the burden of producing positive, material evidence in support of its allegations and "may not rest upon the mere allegations or denials" of its pleading but must establish specific facts showing the existence of a "genuine issue for trial." Fed.R.Civ.P. 56(e). "[A] genuine issue means that the evidence must create a fair doubt, and wholly speculative assertions will not suffice." *Jersey Central Power & Light Company v. Township of Lacey*, 772 F.2d 1103, 1109 (3d Cir.1985). Although the parties in this case continue to dispute what actually occurred, there must be evidence in the record to support the varying interpretations of the events in this case that will create a "genuine issue."

## C. *Plaintiff's Allegations*

In her complaint, plaintiff adopts several theories to impose liability on the present defendants, Clouser and Merrill Lynch. It is obvious from all the submissions, however, that Ryan, who is unfortunately no longer a party in this action, is the sole cause of plaintiff's loss. Plaintiff has sought to tie Ryan's undisputed wrongdoing to Clouser. Questions concerning liability based on fraud ultimately revolve around the nature of the relationship between Clouser and Ryan (D.I. 39, 1), although plaintiff has alleged other torts committed by Clouser alone.

### 1. *Claim of Fraud*

Plaintiff first alleges that Ryan acted as Clouser's agent in defrauding her of the $110,000. The law in Delaware concerning fraud is well settled. As in other jurisdictions, intent must be established for actionable fraud. *Harman v. Masoneilan International, Inc.*, 442 A.2d 487, 499 (Del. Supr.1982). Actionable fraud consists of "a false representation of a material fact knowingly made with intent to be believed

---

called up Merrill Lynch before her break-up with Ryan himself. Plaintiff "couldn't use the phone." Ryan called constantly if he was not at her house, and the line "better have not been busy." (D.I. 25, 138–39.) When she threatened to go to Merrill Lynch, Ryan's response was that she "better not." (*Id.* at 139.) In effect, Ryan exerted nearly total domination over plaintiff, as she revealed in her own words:

"I was very upset and very nervous and frightened when I hired him. And instead of him starving the fear, he fed it. He made it almost—I couldn't go out of the house. I couldn't go anywhere. I couldn't do anything. I couldn't talk to anybody. He just added more fuel to the fire."

(*Id.* at 140.)

This fear was combined with her dependence on on Ryan in all plaintiff's financial dealings. Plaintiff stated in deposition that she had believed that Ryan was looking out for her best interests. (*Id.* at 140–41.)

to one who, ignorant of its falsity, relies thereon and is thereby deceived." *Id.* at 499; *Twin Coach Company v. Chance Vought Aircraft, Inc.*, 163 A.2d 278 (Del. Supr.1960) (citing Restatement [Second] of Torts § 525 (1981)). Fraud may also occur through the deliberate concealment of material facts, or by silence when there is a duty to speak. *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. Supr.1983); *Lock v. Schreppler*, 426 A.2d 856, 860–61 (Del.Supr.1981).

As a complainant in federal court, plaintiff must state her allegations of fraud, as well as the circumstances constituting the fraud, "with particularity." Fed.R.Civ.P. 9(b). Intent "may be averred generally." *Id.*

Plaintiff simply has not met her burden of demonstrating the existence of a material issue of fraud.[15] Plaintiff offered her first and only affidavit only after defendants made a renewed motion for summary judgment. (D.I. 47.) There, as in her deposition taken by defendants (D.I. 25), plaintiff's only factual statement was that Clouser and Ryan were "close friends." (D.I. 47, 2.) Plaintiff also has neglected to take a deposition of Clouser. Apparently, the only evidence of record—the only evidence which plaintiff would be able to introduce at a trial on the merits—would be statements by Clouser and her personal knowledge concerning the relationship of Clouser and Ryan (consisting entirely of statements to her by either Clouser and Ryan). Although offered ample opportunity both during discovery and on motions for summary judgment, plaintiff has offered no evidence whatsoever which could be tested as a matter of credibility, in open court.

Furthermore, plaintiff, in an apparent attempt to meet the pleading requirements under the Federal Rules that the circumstances of the alleged fraud be stated "with particularity," Fed.R.Civ.P. 9(b), alleged that Ryan in consort with Clouser, induced her to cash in her C.D. (D.I. 1, ¶ 15), and that Ryan, as the agent of Clouser, defrauded plaintiff of her C.D. (*Id.* at ¶ 22.) Even assuming that plaintiff has pleaded with the requisite specificity the factual circumstances of the alleged fraud, viewing her allegation in the light most favorable to the non-moving party, *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed. 748 (1977), as the Court must on a motion for summary judgment, the evidence and reasonable inference therefrom show the lack of any substance of plaintiff's claim.

The defendants point out, and plaintiff does not dispute, that the cashing in of the C.D. occurred before the Merrill Lynch account was opened. (D.I. 51, 1.) Plaintiff admitted that she did not have any contact with Clouser or Merrill Lynch at the time she cashed in her C.D. (D.I. 25, 99.) Further, she also admitted she had no contact with either of the defendants in deciding to travel to Wilmington with the proceeds of the C.D. (*Id.*) The use of some of this money to open the account with Clouser does not create any legitimate inference of involvement by Clouser with the actual cashing in of the C.D. Further, there is no evidence to suggest that Clouser assisted Ryan in any way in defrauding plaintiff of the proceeds from her C.D. Plaintiff offers no substantive testimony or records to suggest any connection of Clouser with Ryan other than her blanket and non-specified allegation of collusion, based on Clouser's acquaintance with Ryan through their wives. Plaintiff does not spell out the type of conduct, the circumstances or date, of the alleged fraud but rests her case ultimately on her speculative allegation. Most

---

**15.** This Court denied defendants' initial motion for summary judgment in order to allow plaintiff opportunity to substantiate her allegation of collusion between Clouser and Ryan. The inference of intent to defraud (which can be averred *generally* under the Federal Rules, Fed.R.Civ.P. 9(b)) arising out of Ryan's relationship with Clouser remain pure speculation, even after this Court warned plaintiff to demonstrate some substance to this speculation. Documentary evidence of the Merrill Lynch and Wilmington Trust accounts, and a supplemental affidavit by Clouser, have dispelled the "slight inferences" concerning the relationship which plaintiff in her affidavit could not contradict. (D.I. 47, 53 & 54.)

importantly, the money which plaintiff, through Ryan, ordered withdrawn from the Merrill Lynch Ready Asset Account was always drawn and issued in the form of a check by Clouser, in plaintiff's name alone;[16] it was only afterwards, when Ryan himself convinced her to cash the check, that the fraudulent acts occurred. Plaintiff points to no communication between Ryan and Clouser from which one could reasonably infer collusion.

Summary judgment in favor of defendants is therefore appropriate on the issue of fraud. As the Third Circuit recently stated, "[l]egal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Central Power*, at 1109.[17]

### 2. *Intentional Infliction of Emotional Distress*

■ Plaintiff also alleges a claim for intentional infliction of emotional distress. Under Delaware law, the plaintiff must show that the defendants' intentional conduct was extreme and outrageous and caused plaintiff to suffer severe emotional distress. *Avallone v. Wilmington Medical Center, Inc.*, 553 F.Supp. 931, 938 (D.Del.1982). Plaintiff has produced no evidence to substantiate this claim. Only in November 1981, after the alleged acts had been committed, did plaintiff communicate directly with Clouser for the first time. Moreover, the record contains no evidence

that defendants' conduct in handling plaintiff's account was either extreme or outrageous. Plaintiff herself agreed that her only complaint is that defendants did not contact her directly before November 1981. (D.I. 25, 169.)

### 3. *Negligence and Breach of Fiduciary Duty*

Plaintiff has pleaded the issue of negligence and breach of fiduciary duty on the part of the defendants even less satisfactorily than the issue of fraud. Nevertheless, the Court must determine if there are any inferences on the basis of the whole record which support these claims. Under both theories of liability, Delaware law requires plaintiff to establish a duty and to show that defendant has breached this duty. A court may find liability for negligent nonfeasance where there is an already existing and definite relationship between the parties "of such a character that social policy justifies the imposition of a duty to act." *Murphy v. Godwin*, 303 A.2d 668, 674 (Del. Supr.1973) (citing Prosser, The Law of Torts [4th ed.] § 56 at 339). A fiduciary relationship exists "where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another." *Cheese Shop International, Inc. v. Steele*, 303 A.2d 689, 690 (Del.Supr.1973).

Plaintiff, in her Complaint (*see* Complaint, D.I. 1, ¶ 32), alleged conclusorily

---

**16.** Based on the records from Wilmington Trust and further affidavits, the Court finds that all seven checks were made out to plaintiff alone. (D.I. 25, 155–63.)

**17.** In its previous order denying summary judgment to the defendants, the Court indicated its concern that the issue of collusion involved some question of credibility. (D.I. 41, 2.) However, that concern originated from the lack of evidentiary material in this case which the plaintiff would hopefully produce that would create issues which only oral examination could resolve. Since Ryan is not an available witness, the only source of information concerning Clouser's relationship with him is Clouser. Plaintiff, who is not acting *pro se* in this case, was extremely neglectful to elicit any direct testimony from Clouser during the discovery phase; the Federal Rules are extremely liberal

in facilitating discovery; so as a policy matter alone—beyond any consideration of the substantive aspects of this case—the Court does not wish to grant plaintiff a second chance to rectify its missed opportunity in a costly court proceeding. It is possible plaintiff did not depose Clouser simply because she recognized the consistency and honesty of his statements.

The long and the short of this is that plaintiff is resting her claim of fraud on mere allegations; and the defendants have come forward with additional evidence in support of its motion—unrebutted, uncontradicted testimony of Clouser concerning five or six innocent, social meetings with Ryan. (D.I. 45, ¶ 5.) The Court is convinced that no question of credibility exists with respect to the issue of fraud which should be addressed at a trial.

that defendants had negligently handled her account, had breached a fiduciary duty and had violated certain sections of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1982), New York Stock Exchange ("NYSE") and National Association of Stock Dealers ("NASD") Rules. The sum of plaintiff's argument is as follows. At her November 1981 meeting with Clouser, Clouser told her that he had been "wrong" in not contacting her and in dealing with Ryan. (D.I. 47, ¶ 7.) Neither Clouser nor anyone else at Merrill Lynch personally contacted her with regard to any transaction with Merrill Lynch. (*Id.* at ¶ 9.) In her November 1981 visit Clouser had told her that he was supposed to have a "signature card" on file for her account but that he did not have such a card. (*Id.* at ¶ 10.) Further, "numerous of the correspondence and statements" were sent directly to Ryan at his own address, not to plaintiff at her address in Shamokin. (*Id.* at ¶ 11.)

Defendant admits all of these factual allegations except for the claim that many materials concerning her account were being sent directly to Ryan. The documentary record clearly shows all Merrill Lynch transactions were mailed to her personally at her home. Plaintiff, however, offered no evidence to back up this contention, and the Court agrees with defendants that this is not a material issue.[18]

■ Plaintiff's account at Merrill Lynch was a non-discretionary cash account. Defendants correctly point out that in contrast to the duty arising from a discretionary account, a stockbroker has only a limited duty to a non-discretionary cash account customer. The stockbroker's duty in the latter instance is to serve the client's interest in connection with single transactions executed in the account. *Robinson v. Mer-*

*rill, Lynch, Pierce, Fenner & Smith, Inc.,* 337 F.Supp. 107 (N.D.Ala.1971), *aff'd,* 453 F.2d 417 (5th Cir.1972). In *Robinson,* the plaintiff maintained that the broker had a duty to communicate information to him which would affect his position in the market. *Id.* at 110. The court considered the broker-customer relationship to be one of agency, a "consensual" relationship, which arises only with instructions from the customer. Particularly in cash transactions, the broker's duty arises only when an order is placed, "since defendant did not have discretionary or managerial power over plaintiff's account and therefore had no authority to act for the plaintiff without express direction.... The broker's office ... is simply to buy and sell." *Id.* at 111. In the case at hand, Clouser promptly executed all orders he received from the plaintiff, through Ryan acting as her agent, and communicated this immediately to her. That was all he was required to do.

■ Concerning the other acts or omissions of the defendants, plaintiff has not elaborated what duty the defendants allegedly breached in the handling of plaintiff's account. Plaintiff has offered only Clouser's statement in November 1981 as evidence that the "signature card" was required for such an account. (D.I. 47, ¶ 10.) In the November 1981 meeting, Clouser was surprised and "upset." (D.I. 25, 133.) This Court has found no section in the 1934 Act nor the NYSE Rules from which plaintiff could claim a private cause of action; and the NASD Rules only require written confirmation to each customer upon completion of each transaction.[19] Further, if Merrill Lynch had any internal guidelines which it may have breached in plaintiff's case, plaintiff has made no effort to produce evidence on such guidelines by deposing, for example, Clouser or of other Mer-

---

18. In deposition, plaintiff also conceded that the statements were mailed to her address, but that Ryan would "intercept" them. (D.I. 25, 148–49, 155.)

19. The NASD Rules state, in pertinent part:
    *Disclosure on Confirmations.* A member at or before the completion of each transaction with a customer shall give or send to such customer written notification disclosing (1)

whether such member is acting as a broker for such customer, as a dealer for his own account, as a broker for some other person, or as a broker for both such customer and some other person; and (2) in any case in which such member is acting as a broker for such customer or for both such customer and some other person, either the name of the person from whom the security was purchased or to whom it was sold for such cus-

rill Lynch officers. Even assuming that the duty involved requirement of a "signature card", the *breach of that duty* did not cause the loss of plaintiff's money. Plaintiff herself stated that she would endorse the checks that Merrill Lynch drew up, both Ryan and she would go to cash them, and she would give all the proceeds to Ryan, from which he would give her enough "to pay the bills." (D.I. 25, 155–63.)

Because the Court finds that there is no issue of fraud, intentional infliction of emotional distress, negligence, or breach of fiduciary duty, the plaintiff's equitable claim of constructive trust need not be addressed.

CONCLUSION

This is an unfortunate case in which the plaintiff, unsophisticated in financial and practical matters, fell under the total domination and control of an insidious and conniving individual who systematically bilked her of her money. Unable to find this person, plaintiff turned next to Merrill Lynch and the officer who handled her account, and attempted to fit her claims to the circumstances of her dealings with Merrill Lynch. Clouser and Merrill Lynch were not served until six months after the filing of the complaint. In the two years this case has been pending, however, plaintiff has not offered any specific details of her allegation of collusion between Ryan and Clouser, other than their acquaintance-

ship. Indeed, Clouser came into the picture only after Ryan had convinced plaintiff to cash in her C.D. Thereafter, there exists no evidence that Clouser acted improperly with respect to plaintiff's account; he meticulously reported to her each transaction by written confirmation. Because plaintiff has offered no evidence to show that the relationship between Ryan and Clouser is a material issue in this case, the defendants are entitled to summary judgment on all of plaintiff's claims.

Judgment will be entered in accordance with this Opinion.

tomer and the date and time when such transaction took place or the fact that such information will be furnished upon the request of such customer, and the source and amount of any commission or other remuneration received or to be received by such member in connection with the transaction. Section 12, ¶ 2162, NASD Manual—Rules of Fair Practice (1985). Another section of the NASD Manual requires communication with a customer *only upon the request* of such customer:

*Disclosure of Financial Condition.* (a) A member shall make available to inspection by any bona fide regular customer, *upon request,* the information relative to such member's financial condition as disclosed in its most recent balance sheet prepared either in accordance with such member's usual practice or as required by any State or Federal securities laws, or any rule or regulations thereunder. (b) As

used in paragraph (a) of this rule, the term "customer" means any person who, in the regular course of such member's business, has cash or securities in the possession of such member. Section 22, ¶ 2172, NASD Manual—Rules of Fair Practice (1985) (emphasis added). Finally, the NASD Manual establishes a fiduciary capacity to act with respect to a customer's account only at the request of such customer:

*Use of Information Obtained in Fiduciary Capacity.* A member who in the capacity of paying agent, transfer agent, trustee, or in any other similar capacity, has received information as to the ownership of securities, shall under no circumstances make use of such information for the purpose of soliciting purchases, sales or exchanges except at the request and on behalf of the issuer. Section 9, ¶ 2159, NASD Manual—Rules of Fair Practice (1985).